Maria Temkin, Esq. (*Pro Hac Vice* to be filed)
maria@temkinlegal.com
**TEMKIN & ASSOCIATES, LLC**
1700 Market Street, Suite 1005
Philadelphia, PA 19103
Telephone: (215) 939-4181
Facsimile: (215) 914-6975

Counsel for Return on Intelligence, Ltd. and
Return on Intelligence, Inc., Plaintiffs

Pamela M. Egan – State Bar No. 224758
pamela.egan@rimonlaw.com
**RIMON P.C.**
One Embarcadero Center, Suite 400
San Francisco, CA 94111
Telephone: (415) 688-4622
Facsimile: (415) 683-5472

Local Co-Counsel for Return on Intelligence, Ltd. and
Return on Intelligence, Inc., Plaintiffs

# UNITED STATES DISTRICT COURT

## NORTHERN DISTRICT OF CALIFORNIA

| | |
|---|---|
| **RETURN ON INTELLIGENCE, LTD**, a corporation formed under the laws of Bermuda, and **RETURN ON INTELLIGENCE, INC.**, a Delaware corporation,<br><br>Plaintiffs,<br><br>vs.<br><br>**GREGORY SHENKMAN**, a California citizen,<br><br>Defendant. | Case No. 3:18-cv-262<br><br>**COMPLAINT**<br><br>**DEMAND FOR JURY TRIAL** |

Plaintiffs, Return on Intelligence, Ltd. ("ROI, Ltd.") and Return on Intelligence, Inc. ("ROI, Inc.") (collectively, "ROI" or "Plaintiffs") allege against Defendant Gregory Shenkman ("Shenkman") as follows:

## INTRODUCTION

1. ROI is a global technology services firm, which provides technology consulting, systems integration and commercial software solutions services. ROI assists its clients in

insurance, banking and telecommunications industries to design and implement core systems transformation solutions. With its principal office in Pennsylvania, ROI has a global network of delivery teams located across the United States, Russia, Ukraine, Latvia and Western Europe employing over 400 people.

2.  Shenkman is a disgruntled former director of ROI with a long history of professional and business misconduct, including bad management practices and misuse of funds, breach of fiduciary duties, and inappropriate relations with lower-ranked female employees resulting in the filing of two sexual harassment lawsuits. Shenkman was finally replaced as a board director on July 30, 2015.

3.  Having access to ROI's confidential information as a board member, in an attempt to unjustifiably enrich himself, Shenkman unlawfully and tortiously interfered with a sale of business assets transaction between ROI and EPAM Systems, Inc., a Pennsylvania based publicly traded company (NYSE: EPAM) and a leading global provider of complex software engineering solutions and information technology services – a transaction which would have been in the best interests of ROI and its shareholders (the "EPAM Transaction").

4.  Knowing that the EPAM Transaction was about to close, Shenkman breached his fiduciary duty as a then-director of ROI by filing a baseless arbitration demand, falsely claiming that he was a secured creditor and ROI owed him $2.9 million when he knew very well that the obligation did not exist.[1] The demand was made and then filed during the final stage of negotiations and closing in July 2015. Shenkman then threatened ROI that he would reach out to EPAM and hijack the deal, unless ROI met his demands. Upon information and belief, when ROI refused, Shenkman did reach out to EPAM with unlawful money demands, insisting that he be paid funds for the deal to close.

5.  As a result of Shenkman's actions and their purported impact on the value of the assets to be acquired, EPAM terminated the $8,000,000 deal causing substantial injury to ROI.

---

[1] The arbitration has since been dismissed on procedural grounds.

2

**THE PARTIES**

6. ROI, Ltd. is a Bermuda-chartered company with a principal place of business in Bermuda. ROI, Ltd. is the sole shareholder of Return on Intelligence, Inc. ("ROI, Inc.") (collectively, "ROI" or "Plaintiffs").

7. ROI, Inc. is a corporation incorporated under the laws of Delaware and registered office at 1628 JFK Boulevard, Suite 1404, Philadelphia, Pennsylvania. No corporate activities of ROI, Inc. are directed, controlled, or coordinated from California. At the time of filing of this Complaint, ROI, Inc.'s principal place of business is in Chicago, Illinois.

8. Upon information and belief, Shenkman is an individual residing in San Mateo County, State of California.

**JURISDICTION**

9. Jurisdiction lies under 28 U.S.C. §1332(a) because there is complete diversity of citizenship between all Plaintiffs and the Defendant and the amount in controversy is in excess of $75,000.

10. Venue lies in this District pursuant to 28 U.S.C. § 1391(b)(1) because Defendant resides in this District.

**INTRADISTRICT ASSIGNMENT**

11. This civil action arises in the counties of San Mateo and San Francisco within the State of California.

12. This case should be assigned to the San Francisco or Oakland division of the Court.

**FACTUAL ALLEGATIONS**

13. ROI is a global technology services firm which provides technology consulting, systems integration and commercial software solutions services. ROI assists its clients in insurance, banking and telecommunications industries to design and implement core systems transformation solutions.

14. From 2008 until December 2012, Shenkman was a *de facto* director of ROI, Inc. actively involved in overseeing the management of the company. From January 2013 through June 2013, he was an actual director of ROI, Inc.

15. Shenkman is a shareholder of ROI, Ltd. and had been a director since its inception until he was voted off the board by the shareholders following numerous instances of bad faith actions taken against the best interests of ROI, issues including bad management practices, misuse of funds, interfering with the EPAM Transaction in an attempt to unjustifiably gain interest for himself, and misconduct towards lower ranked female employees resulting in the filing of sexual harassment lawsuits, *Nenaydokh v. Shenkman*, Superior Court of California, Case No. CGC-14-537729 and *Kharchenko v. Shenkman*, Superior Court of California, Case No. CGC-09-485624.

## 2012 - LETTER AGREEMENT
## CONVERTING SHAREHOLDER LOANS INTO EQUITY

16. Between 2006 and 2012, as a shareholder, Shenkman, personally and via his family trust made unrecorded cash contributions to ROI in the approximate amount of $2.9 million (the "Shenkman's Investment Funds"). Only one of these contributions was ever documented.

17. Other shareholders also made cash contributions to fund shortfalls for operating expenses of ROI, Ltd.'s subsidiaries. This sporadic funding required an adjustment of how distributions would be made in the event there were distributions of cash or equity.

18. On December 13, 2012, a Letter Agreement was entered into by ROI, Ltd., Shenkman and other shareholders. Excerpts are attached as **Exhibit A** (the "December 2012 Letter Agreement").

19. Pursuant to the December 2012 Letter Agreement, the parties recognized previously-made cash contributions and agreed that any funds previously advanced to ROI by any of the parties would, from that date forward, be deemed to constitute capital contributions and not loans.

20. Shenkman's Investment Funds were recorded as capital contributions and included into the amount of the shareholders' cash contributions in Section 3.1.

4

21. Pursuant to Section 3.6 of the December 2012 Letter Agreement, no other amounts lent or other contributions made to ROI prior to December 13, 2012 could be claimed or characterized as loans.

22. Pursuant to Section 3.7 of the December 2012 Letter Agreement, "all loans ceased to accrue interest on and after December 1, 2012, and amounts of such loans shall not increase."

23. Pursuant to Section 5.1, "in a liquidation of [ROI, Ltd.] . . . all of [ROI, Ltd.'s] indebtedness existing as of [December 13, 2012] . . . shall be treated as equity or capital calls with no seniority over any other contributions by the Parties."

24. Consistent with the December 2012 Letter Agreement, on June 6, 2013, the Board of Directors of ROI, Ltd. held a meeting to approve designation of additional Series A Preferred Shares and ratify the subscription of, *inter alia*, Shenkman against the cancellation of debt.

25. Shenkman was present at the June 6, 2013 Board meeting and did not oppose the resolution of the Board.

26. Except for Shenkman, all parties to the December 2012 Letter Agreement converted their loans to Series A Preferred Shares or ROI, Ltd.

### 2014 SECRET LOAN AGREEMENT

27. In April 2013, ROI replaced Yuri Shtivelman who was then CEO of ROI with new management headed by Gordon Brooks.

28. In December 2014, in violation of the December 2012 Letter Agreement Shenkman persuaded Gordon Brooks to document Shenkman's Investment Funds as current and outstanding loans.

29. On December 24, 2014, Gordon Brooks and Shenkman signed a loan agreement declaring the Shenkman's Investment Funds to be loans (the "2014 Loan Agreement").

30. A condition precedent to the 2014 Loan Agreement becoming effective was that certain changes be made to the existing Shareholder Agreement among certain ROI, Ltd. shareholders. These changes were prepared in the form of an amendment to the Shareholder Agreement and circulated for signing to the ROI, Ltd. shareholders who were parties to the

Shareholder Agreement (the "Amendment"). The Amendment was never signed by the shareholders.

31. On June 8, 2015, nearly six months after the Amendment was circulated and with it remaining unsigned, ROI, Ltd.'s board of directors declared that the 2014 Loan Agreement was null and void, as the conditions precedent to its effectiveness were not satisfied.

## THE EPAM TRANSACTION

32. EPAM Systems, Inc., a Pennsylvania based publicly traded company (NYSE: EPAM) a leading global provider of complex software engineering solutions and information technology services to clients throughout North America, Western and Eastern Europe, Russia and Asia. The Company serves primarily Fortune Global 2000 companies in various industries including technology, banking and financial services, business information and media, and travel and hospitality.

33. EPAM'S headquarters are in Newtown, Pennsylvania with multiple satellite offices and delivery centers located worldwide.

34. By late 2012, ROI started experiencing serious financial difficulties and was searching for potential remedies through either investment or a possible merger and/or acquisition.

35. During the subsequent years, ROI engaged in preliminary negotiations with various entities regarding the potential sale of certain ROI's assets and assigning certain of its liabilities for consideration.

36. After much review and discussions, the directors of ROI, Ltd., including Shenkman, determined that a transaction with EPAM would resolve ROI's financial difficulties and was in the best interest of ROI, its creditors and shareholders.

37. On April 7, 2015, EPAM signed a Mutual Confidentiality and Nondisclosure Agreement which allowed EPAM to conduct a due diligence inspection of ROI's business operations.

38. By June 2015, Plaintiffs and EPAM had completed due diligence and agreed on all material terms of the deal pursuant to an Asset Purchase Agreement, whereby ROI, Ltd. would sell

1  certain of its assets and assign certain liabilities, and ROI, Inc. would sell substantially all of its
2  assets and assign certain liabilities to EPAM for approximately $8,000,000.00 (eight million US
3  Dollars) (the "Sale Proceeds").

4      39.     The parties intended to close the deal by the end of July 2015.

5      40.     The deal would allow ROI to continue operations without disruption, repay
6  outstanding liabilities to creditors, and start working on new projects resulting in an influx of new
7  revenues and the company's growth.

## SHENKMAN'S BAD FAITH PAYOFF DEMAND
## TO ROI AND EPAM

10      41.     As a then board director, Shenkman knew of the ongoing negotiations with EPAM
11  and that the closing of the EPAM Transaction was scheduled for the end of July 2015.

12      42.     On July 13, 2015, ROI received correspondence from Shenkman's counsel, Loren
13  Kieve, Esq., enclosing a copy of the Arbitration Demand and a draft letter to EPAM. **Exhibit B**
14  (July 13, 2015 Kieve Letter, the "Demand Letter"); **Exhibit C** (July 13, 2015 draft Kieve Letter to
15  EPAM, the "Payoff Letter").

16      43.     The Payoff Letter provided instructions to EPAM to wire Shenkman and his family
17  Trust[2] the amount of $3,873,755, which Shenkman claimed represented the principal and interest
18  Shenkman and the Trust were allegedly owed as creditors pursuant to the 2014 Loan Agreement.

19      44.     Shenkman demanded that ROI tender the Payoff Letter to EPAM "in a timely
20  fashion at least three business days prior to the closing" of the EPAM Transaction, so Shenkman
21  could receive a payment of the Shenkman's Investment Funds from the proceeds of the EPAM
22  Transaction.

23      45.     The Demand Letter also notified ROI that if they were not prepared to tender the
24  Payoff Letter to EPAM, then Shenkman and the Trust would submit it to EPAM themselves.

---

[2] Upon information and belief, Shenkman controls and allegedly is a beneficiary of the Grigory and Yelena Shenkman Family Trust (the "Trust").

7

46. Shenkman's sole purpose for making the demand was to interfere intentionally with the EPAM Transaction for his personal benefit which was in conflict with the best interests of ROI, its shareholders and creditors.

47. On July 14, 2015, counsel for ROI, Ltd. replied that Shenkman and the Trust were not *bona fide* creditors, and, therefore, ROI, Ltd. would not be sending the Payoff Letter to EPAM. **Exhibit D** (July 14, 2015 Letter from Gene T. Barton, Jr. of Pepper Hamilton LLP).

48. ROI, Ltd.'s July 14, 2015 letter also warned that if Shenkman contacted EPAM or in any way interfered with the EPAM Transaction, such conduct would constitute a breach of Shenkman's fiduciary duties as a director, as well as tortious interference with advantageous relations.

49. Upon information and belief, when ROI refused to make payments to Shenkman and send the Payoff Letter to EPAM, Shenkman proceeded himself to send the letter to EPAM to its Newtown, PA address.

50. Upon information and belief, Shenkman also reached out directly to EPAM's management in Pennsylvania to discuss ROI's business transactions and implications of his extortionate payoff demand.

**FILING OF FRIVOLOUS ARBITRATION DEMAND**

51. On July 16, 2015, Shenkman and the Trust commenced arbitration proceedings before the American Arbitration Association ("Arbitration" or "Arbitration Demand") against, *inter alia*, ROI, Ltd. and individual directors and officers of ROI, Ltd.

52. In the Arbitration Demand, Shenkman and the Trust falsely claimed to be the secured creditors of ROI and demanded an immediate payment of the principal and interest on the purported loans (*i.e.*, the Shenkman's Investment Funds), which Shenkman had agreed to have recognized as equity pursuant to the 2012 December Letter Agreement to which Shenkman was a signatory.

53. Upon information and belief, Shenkman's sole purpose for filing the frivolous Arbitration Demand was to interfere with the EPAM Transaction for his personal benefit,

improperly using and abusing confidential information available to him as a director. Shenkman filed the Arbitration Demand knowing that it would lead EPAM to refuse and cancel the deal causing significant damage to ROI. The Arbitration Demand was designed to coerce ROI to settle with Shenkman so he would withdraw the arbitration claim and allow the EPAM Transaction to close. ROI refused any negotiations, settlements, and unjustified payments to Shenkman.

54. On January 4, 2016, the Arbitration Demand was dismissed for lack of arbitral jurisdiction.

### TERMINATION OF THE ASSET SALE TRANSACTION BY EPAM

55. Immediately upon filing of the Arbitration Demand and receiving the Payoff Letter, EPAM became concerned about ROI, Ltd.'s ability to transfer title to its assets free and clear of all claims.

56. Despite ROI's offer to post cash collateral, on August 20, 2015, EPAM confirmed that EPAM is "unable to move forward with ROI based on the current situation. . . . . ROI's inability to provide clear title at closing is simply unacceptable to EPAM . . . . I acknowledge a lot of work has been done on this deal from both sides and thank you and your team for all of your efforts." **Exhibit E** (August 20, 2015 E-mail from S. Bale).

57. Shenkman knew that filing the Arbitration and asserting creditor's rights would inhibit ROI's ability to provide EPAM clear title and he knew that these actions would deter EPAM, a publicly traded corporation, from following through with the EPAM Transaction.

58. As a direct result of Shenkman's conduct designed to coerce ROI in making unjustified payments to Shenkman, the EPAM Transaction failed to close.

### DEPARTURE OF ROI'S EMPLOYEES

59. As a result of the failure of the EPAM Transaction and subsequent ROI's inability to pay its long-term liabilities, essential management employees left ROI by the end of 2015.

60. Upon information and belief, after the failed EPAM Transaction, Shenkman intended to cause further damage to ROI and reached out to these employees to convince them to leave ROI.

## FIRST CLAIM FOR RELIEF
### (Intentional Interference with Prospective Contractual Relations)

61. Plaintiffs reassert, reallege, and incorporate by reference the preceding Paragraphs as though they had been fully set forth herein.

62. At all times relevant hereto, ROI had a prospective contract with EPAM under which EPAM was to purchase certain assets of Plaintiffs for approximately $8,000,000 pursuant to a draft Asset Purchase Agreement.

63. At all times relevant hereto, Shenkman had knowledge of ROI's negotiations and business relationship with EPAM and the prospective Asset Purchase Agreement between ROI and EPAM.

64. Shenkman with the intent to cause harm to ROI intentionally interfered with the EPAM Transaction by, among other things, sending correspondence to EPAM and filing a frivolous Arbitration Demand, in which Shenkman made a meritless claim that Shenkman and the Trust are secured creditors of ROI, Ltd. Based on this meritless secured creditor claim, Shenkman demanded that ROI, Ltd. tender to EPAM a demand for payment under the draft Asset Purchase Agreement in the form of a Payoff Letter.

65. As a result of Shenkman's unlawful conduct, EPAM backed out of the Asset Purchase Agreement.

66. As a direct and proximate cause of Shenkman's intentional interference, Plaintiffs have suffered damage and continue to suffer damages, which include but are not limited to the loss of the purchase price of the Asset Purchase Agreement, loss of key personnel, increased business risks due to inability to pay creditors as intended, the loss of direct and indirect benefits they would have received from the asset sale, and increased legal expenses to defend from Shenkman's baseless allegations.

67. Plaintiffs are entitled to judgment against Shenkman for intentional interference in an amount not less than $8,000,000, plus costs, interest and all consequential damages.

68. Plaintiffs are also entitled to an award of punitive damages to be determined at trial because the interference by Shenkman was intentional, willful, wanton and reckless.

## SECOND CLAIM FOR RELIEF
### (Breach of Fiduciary Duty)

69. Plaintiffs reassert, reallege, and incorporate by reference the preceding Paragraphs as though they had been fully set forth herein.

70. At all relevant times Shenkman was a director of ROI, Inc. and owed ROI, Inc. fiduciary duties of loyalty, care and good faith.

71. At all relevant times Shenkman served as a director of ROI, Ltd. and owed ROI, Ltd. fiduciary duties of loyalty, care and good faith.

72. Because ROI, Ltd. is registered in Bermuda, the laws of Bermuda are applicable. Section 97 of the Bermuda Companies Act of 1981 (Duty of Care of Officers) imposes a duty of care of officers of companies organized under the Act:

73. Every officer of a company in exercising his powers and discharging his duties shall— act honestly and in good faith with a view to the best interests of the company; and exercise the care, diligence and skill that a reasonably prudent person would exercise in comparable circumstances.

74. As a director of ROI Ltd, Shenkman had insider knowledge of the EPAM Transaction and that the closing of the EPAM Transaction would have enabled ROI to pay off its outstanding obligations and liabilities, including repaying creditors' loans.

75. By sending a demand letter to EPAM and filing the baseless Arbitration Demand, Shenkman acted contrary to the interests of ROI in order to block the sale from occurring.

76. Shenkman's conduct was particularly egregious because he used information learned as a director regarding the EPAM Transaction to block the deal under the guise of a purported creditor's claim.

77. As a result of Shenkman's breaches of fiduciary duties, Plaintiffs have suffered and continue to suffer harm.

78. Plaintiffs are entitled to judgment against Shenkman for his breaches of fiduciary duties in an amount not less than $8,000,000 plus costs, interest and all consequential damages.

79. Plaintiffs are also entitled to an award of punitive damages to be determined at trial as a result of Shenkman's willful, wanton and reckless misconduct.

### THIRD CLAIM FOR RELIEF
### (Civil Conspiracy to Commit an Unlawful Act)

80. Plaintiffs reassert, reallege, and incorporate by reference the preceding Paragraphs as though they had been fully set forth herein.

81. Between January 2015 and August 2015, Shenkman, without authorization from the Board, reached out to EPAM and provided it certain confidential information about ROI business.

82. After the failed EPAM Transaction and ROI's refusal to submit to Shenkman's baseless demands to pay him, Shenkman intended to cause further damage to ROI and reached out to key management employees to convince them to leave ROI for EPAM. Shenkman and EPAM made concerted actions acting for a common goal to cause further damages to ROI.

83. Shenkman's conduct was willful, wanton, intentional, malicious and reckless.

84. As a result of Shenkman's unlawful conduct, ROI suffered further damages including but not limited to the loss of its key employees.

### JURY DEMAND

85. The Plaintiffs demand a jury trial.

**WHEREFORE**, Plaintiffs request relief against Defendant Gregory Shenkman as follows:

A. Finding that Defendant's conduct constitutes unlawful interference of Plaintiffs' contractual relations with EPAM;

B. Finding Defendant's conduct constitutes breach of fiduciary duty to ROI;

C. Finding Defendant's conduct constitutes civil conspiracy to commit unlawful act;

D. Awarding actual, nominal, punitive, compensatory, and consequential damages in the maximum amount to be proved at trial but no less than $8,000,000;

E. Preliminary and permanent injunctive relief including prohibition from interfering with the ROI's clients and business operations;

1    F.   Awarding Plaintiffs' full costs of suit, including attorneys' fees and costs, if
2 permitted by applicable laws;
3    G.   Awarding attachment and imposition of constructive trust upon the property,
4 assets, and monies of Defendants and other equitable relief, if permitted by applicable laws;
5    H.   Awarding pre-judgment and post-judgment in the maximum amount permitted by
6 law;
7    I.   Awarding such other relief as the Court deems equitable, just and proper.

DATED: January 10, 2018                    RIMON P.C.

                                           ____/s/ Pamela M. Egan____
                                           Pamela M. Egan, CA State Bar No. 224758
                                           Local Co-Counsel for Return on Intelligence, Ltd.,
                                           and Return On Intelligence, Inc., Plaintiffs

DATED: January 10, 2018                    TEMKIN & ASSOCIATES, LLC

                                           ____/s/ Maria Temkin____
                                           Maria Temkin (*pro hac vice* pending)
                                           Co-Counsel for Return on Intelligence, Ltd., and
                                           Return on Intelligence, Inc., Plaintiffs