UNITED STATES DISTRICT COURT

NORTHERN DISTRICT OF CALIFORNIA

| | |
|---|---|
| RETURN ON INTELLIGENCE, LTD., and RETURN ON INTELLIGENCE, INC., <br><br> Plaintiffs, <br><br> v. <br><br> GREGORY SHENKMAN, <br><br> Defendant. | Case No. 18-cv-00262-JSW <br><br> **FINDINGS OF FACT AND CONCLUSIONS OF LAW** |

This matter came before the Court for a bench trial on claims for intentional interference with prospective economic relations and breach of fiduciary duty brought by Plaintiffs, Return on Intelligence, Ltd. ("ROI Ltd.") and Return on Intelligence, Inc. ("ROI Inc."), against Defendant Gregory Shenkman ("Shenkman").[1]

The Court has considered the testimony, evidence, pre-trial and post-trial briefing, and relevant legal authority. For the reasons that follow, the Court concludes the ROI Entities fail to prove Mr. Shenkman is liable to them.[2]

**WITNESSES**

The Court heard testimony from the following witnesses, none of whom were materially impeached at trial.

---

[1] Plaintiffs withdrew their claim of civil conspiracy on the first day of trial. (Tr. 12/4/23 at 9:12-18.)

[2] Plaintiffs did not always distinguish between themselves when discussing the events that gave rise to this litigation. It is undisputed that ROI Ltd. is the sole shareholder of ROI, Ltd. (Dkt. No. 131, Joint Proposed Pretrial Order, Sec. III, Stipulated Facts at 3:6-7 ("Stipulated Facts"); *see also* Dkt. No. 157, Trial Transcript 12/4/23 ("Tr. 12/4/23") at 26:6-7.) Unless it is material to the Court's analysis, the Court refers to Plaintiffs as the "ROI Entities."

**Sergiy Synyanskyy** – Mr. Synyanskyy testified on behalf of the ROI Entities. He has been involved in various capacities with the ROI entities since 2007, acted as a restructuring manager in 2013, and was appointed to their Boards in June 2015 as a representative of another investor in Exigen Capital, an investment fund that held the ROI Entities within its portfolio of companies (the "Fund"). (Tr. 12/4/23 at 26:9-13, 26:16-18, 27:10-21; 28:3-9, 53:5-25, 56:11-57:2, 90:7-15; Tr. 12/5/23 at 187:6-11.)[3] Mr. Synyanskyy candidly admitted when he did not have knowledge of certain facts. Based on his overall demeanor at trial, the Court finds Mr. Synyanskyy's testimony credible.

**Alexander Novak** – Mr. Novak testified on behalf of the ROI Entities.[4] He became CEO and a member of the ROI Entities' Boards in May 2015. (Tr. 12/4/23 at 139:17-19, 141:20-25; Tr. 12/5/23 at 181:16-17.) Before he became the ROI Entities' CEO, he was a general partner in the Fund. (Tr. 12/4/23 at 139:20-23, 140:4-5; Tr. 12/5/23 at 181:24-182:2.) Based on his overall demeanor, the Court finds Mr. Novak's testimony credible.

**Gregory Shenkman** – The ROE Entities called Mr. Shenkman as a witness during their case in chief. He testified for all purposes on the second and third days of trial. Mr. Shenkman was a shareholder in the ROI Entities and was a member of their Boards of Directors. Based on his overall demeanor, including non-responsive answers and a selective recollection of material events, the Court does not find Mr. Shenkman's testimony entirely credible.[5] The Court credits his testimony over other witnesses either when there is corroborating evidence or a lack of contradictory evidence.

**Arkadiy Dobkin** – Mr. Dobkin is the founder and Chief Executive Officer of EPAM. He testified as a corporate designee of EPAM Systems, Inc. ("EPAM") and in his personal capacity.

---

[3]   The ROI Entities were founded using the name Exigen Services or derivatives thereof.

[4]   With the agreement of the parties, the Court permitted Mr. Novak and Mr. Shenkman to testify remotely.

[5]   By way of example only, Mr. Shenkman neither recalled when he became a member of the ROI Entities' Boards nor recalled how long he served in that role. (Tr. 12/5/2023 at 185:12-186:5.)

The parties presented Mr. Dobkin's testimony by deposition designations. (*See* Dkt. No. 156-2 (Deposition Designations of Arkady Dobkin ("Dobkin Depo.")).) The Court makes no credibility determinations regarding his testimony.

## FINDINGS OF FACT[6]

**A.   Mr. Shenkman's Financial Transactions with the ROI Entities.**

1. Mr. Shenkman and the Grigory and Yelena Shenkman Family Trust (the "Shenkman Trust") made three loans to ROI, Ltd. for $270,000, $1,000,000, and $350,000, in 2006, 2007, and 2010, respectively, which were documented at a later date in a Loan Agreement. (Tr. 12/4/23 at 81:12-21; Dkt. No. 155, Joint Certification of Admitted Exhibits, Ex. 7 (Loan Agreement at 2).) Although the sum of those three loans is $1,620,000, the Loan Agreement states that the total amount of the loans is $2,120,000. (*Id.*)

2. Mr. Shenkman explained that the $2,120,000 included accumulated interest. (Tr. 12/5/23 at 199:8-25.) The ROI Entities did not materially impeach him on that point, and the terms of the Loan Agreement provide support for his interpretation of the total due. (*See* Loan Agreement, § 1.1(b).)

3. The parties defined the "Effective Date" of the Loan Agreement as "the date when all parties to that certain Shareholders Agreement … execute and release out of escrow an Amendment to that Shareholders Agreement (sections 7.2, 10.5, and 10.6 being amended)." (Loan Agreement at 1.)[7] There is no evidence that the relevant parties executed the amendment.

4. Exhibit C to the Loan Agreement is a Non-Convertible Term Note between ROI,

---

[6] To the extent that any of the Court's findings of fact are included in the Court's conclusions of law, they shall be deemed findings of fact. Similarly, to the extent that any of the Court's conclusions of law are included in the findings of fact, they shall be deemed conclusions of law.

[7] The Shareholders Agreement is not part of the record. It is defined as: "Amended and Restated Shareholders Agreement dated as of December 19, 2012, by and among [ROI, Ltd.], Daletona Global Limited, … Exigen East, LLC, … Exigen (USA), Inc., …, Exigen Properties, Inc., Exigen Canada, Inc., … Exigen Asia Pacific Pty. Ltd., … Exigen Latvia, …, Exigen Lithuania, …, Gordon Brooks, Jonathan Kalman and Allan Frank[.]" (*See* Loan Agreement at 1.) ROI, Ltd.'s Board terminated the amended agreement at a meeting on June 8, 2015. (Tr. 12/4/23 at 57:8-61:14; Ex. 20 (ROI Ltd. Board Meeting Minutes, June 8, 2015 ("6/8/15 Minutes") ¶ 5).)

Ltd. and Mr. Shenkman in the amount of $2,120,000 issued on December 24, 2014 ("12/24/14 Note"). The 12/24/14 Note does not include the Shenkman Trust in the definition of "Lender." (Loan Agreement at 7.)

5. The Shenkman Trust also loaned ROI Ltd. $780,000, which was documented in a Convertible Secured Promissory Note dated June 25, 2012 ("6/25/12 Note"). (Tr. 12/4/23 at 81:12-21; Ex. 8 (6/25/12 Note).)

6. On December 13, 2012, the Fund, Mr. Shenkman, Mr. Novak, the ROI Entities, and other individuals and entities not parties to this litigation, executed a Letter Agreement. (Tr. 12/4/23 at 34:15-36:13; Ex. 1 (Letter Agreement).) The purpose of the Letter Agreement was "to capture a simple set of directives … so that the Parties can move their relationship forward with respect to the Fund, as well as its portfolio companies." (Letter Agreement at 1.)

7. As part of the Letter Agreement, Mr. Shenkman agreed that he had provided $42,890,094.60 "in cash in response to capital calls by the Fund and Exigen Services, and as loans to the Fund and Exigen Services from October, 2006 through [December 13, 2012]," which would "be deemed to constitute capital contributions to the Fund for all purposes under the Partnership Agreement."[8] (*Id.* § 3.1; *see also id.* § 3.5.4 ("All Fund Capital Contributions shall be treated as capital contributions to the [Fund] made pursuant to capital calls and shall not constitute debt of the [Fund].").)[9]

8. The parties to the Letter Agreement also agreed that "except as set forth in this agreement, as of [December 13, 2012], no other amounts have been lent by or on behalf of the Fund Parties and no other contributions to the Fund and [ROI Ltd.] by or on behalf of the Fund Parties can be claimed or interpreted as loans." (*Id.* § 3.6.)

9. The Letter Agreement also provides that "any loans from the Parties to the Partnership or [ROI Ltd.] ceased to accrue interest on and after December 1, 2012, and amounts of loans such loans shall not increase, unless such an increase is unanimously approved by the

---

[8] The Partnership Agreement also is not part of the record.

[9] The terms "Fund" or "Partnership" are used interchangeably throughout the Letter Agreement. The Court uses the term "Fund" for consistency.

4

Managers." (*Id.* § 3.7; *see also* Tr. 12/4/23 at 123:6-25.)

10. Mr. Novak testified that the Letter Agreement contemplated that "all of the loans made by all of the investors …. into any entity within Exigen Capital or [its] portfolio companies should be treated and must be converted into equity." (Tr. 12/4/23 at 79:15-24.)

11. The Shenkman Trust was a party to the $2,120,000.00 Loan Agreement. It was not a party to the Letter Agreement that required any loans to the ROI Entities to be converted to equity.

12. Notwithstanding the terms of the Letter Agreement, the ROI Entities included the $2,120,000 loan referenced in the Loan Agreement in their financial statements as of April 11, 2015, with the following note: "subordinated; effective subject to execution of amendment #1 to shareholder agreement." (Tr. 12/6/23 at 293:12-294:13, 332:20-333:1, Ex. 22 at ROI0271.)

13. The ROI Entities also included the $780,000 debt to the Shenkman Trust in the financial statements as of April 11, 2015. (Ex. 22 at ROI0271.)

14. Mr. Synyanskyy testified that these loans continued to be carried on the ROI Entities' books at least until June 8, 2015. According to his testimony, the ROI Entities' investors did not understand why they remained on the books. (*See* Exs. 1, 7, 23 at ROI000793 (describing $7 million debt); *see also* 12/4/23 Tr. at 95:10-96:25, 103:13-105:4.) In the ROI Entities' view, the Letter Agreement extinguished those loans. (*See, e.g.,* Tr. 12/4/23 at 116:2-7, 151:15-25, Ex. 4 (Letter from Loren Kieve dated July 14, 2015).)

15. On June 8, 2015, ROI Ltd.'s Board held a telephonic board meeting. Mr. Shenkman received notice of the meeting but did not attend. (6/8/15 Minutes ¶ 2; Tr. 12/4/23 at 91:8-10, 91:23-92:5.) During that meeting, the directors discussed the Loan Agreement and declared the Loan Agreement and the 12/14/24 Note "null and void" because "it [was] clear that the condition to the effectiveness of the Loan Agreement will not be satisfied[.]" (Minutes, ¶ 4; *see also* 12/4/23 Tr. at 78:8-21.)

16. The ROI Entities did not give Mr. Shenkman advance warning of their intent to void the Loan Agreement or the 12/14/24 Note. (Tr. 12/6/23 at 320:23-321:12; Ex. 29 (June 8, 2015 Agenda).)

**B.     The Proposed ROI-EPAM Transaction.**

17.   By late 2012, the ROI Entities started experiencing serious financial difficulties. Mr. Shenkman was aware of those difficulties. (Stipulated Facts at 3:14, 4:2-3.)

18.   The ROI Entities began to search for potential remedies, including a possible acquisition. (Stipulated Facts at 3:14-15; Tr. 12/5/23 at 188:18-189:5, 190:4-13.) By March 2015 ROI, Ltd. began to discuss the possibility of a transaction with EPAM. (Stipulated Facts at 3:11-13, 15-18; Tr. 12/4/23 at 63:5-64:11, 67:12-17, 142:20-143:9.)

19.   Mr. Novak negotiated the terms of the transaction with Mr. Dobkin for EPAM. He initially anticipated the parties would finalize the transaction by the end of July 2015. (Tr. 12/4/23 at 64:10-11, 145:5-20, 147:21-22, 148:14-22, 155:13-16.) The decision makers on EPAM's side were Mr. Dobkin, EPAM's Chief Financial Officer, and one of EPAM's legal representatives. (Dobkin Depo. at 17:21-18:2.)

20.   Mr. Shenkman was aware of the potential transaction with EPAM but was not involved the negotiations. (Stipulated Facts at 4:1-2; Tr. 12/5/23 at 190:24-191:7, 201:9-11, 225:14-16.)

21.   By mid-July 2015, the ROI Entities and EPAM completed due diligence. A draft Asset Purchase Agreement existed as of July 27, 2015. (Stipulated Facts at 3:19-21; Dobkin Depo. at 31:3-7, 32:12-20, Ex. 30 (Excerpt of Draft Asset Purchase Agreement ("Draft APA") at 1).)

22.   The proposed transaction called for ROI, Ltd. to sell certain of its assets and to assign certain liabilities to EPAM and for ROI, Inc. to sell substantially all its assets to EPAM. (Stipulated Facts at 3:21-23; Tr. 12/4/23 at 71:9-19; *see also* Dobkin Depo. at 18:3-24, 19:7-12, 19:22-20:24.)

23.   Because EPAM was only interested in specific aspects of the ROI Entities' business, the ROI Entities did not provide EPAM with a full complement of financial statements. (Tr. 12/4/23 at 147:11-20, 160:10-20.)

24.   The initial sale price was $8,000,000. EPAM subsequently decided it did not want

6

to purchase a specific portion of the ROI Entities' business and reduced its offer to $7,000,000. (*See, e.g.,* Stipulated Facts at 3:22-23; Tr. 12/4/23 at 57:8-61:14, 76:1-3; Ex. 20, Minutes of June 8, 2015, meeting of ROI Ltd. Board ¶ 7 ("Minutes"); Draft APA at 1).)

25. The ROI Entities anticipated the funds they would receive from the transaction would cover outstanding tax liabilities, cover their commercial debt, and provide some working capital. (Tr. 12/4/23 at 75:1-77:2, 131:4-13.) Mr. Synyanskyy also agreed that completing the transaction would benefit the ROI Entities' shareholders, including Mr. Shenkman. (*Id.* at 101:10-17.)

26. Mr. Shenkman expected that if the EPAM transaction closed, the ROI Entities would pay him and the Shenkman Trust the amounts due on what, in his view, were the outstanding loans. (Tr. 12/5/23 at 203:20-25.)

C. **Mr. Shenkman Is Removed from the ROI Entities' Boards and Files an Arbitration Demand Relating to the Loans.**

27. Mr. Shenkman was voted off ROI, Ltd.'s Board between July 29, 2015, and July 31, 2015. (Stipulated Facts at 3:9-10, 4:1-5; *see also* Tr. 12/4/23 at 81:12-21; Tr. 12/6/23 at 317:16-18, 318:7-10, 320:12-21; Ex. 6 (Arbitration Demand at 2, 6, 21); Ex. 28.)

28. The ROI Entities did not introduce minutes from the meeting during which the Board removed Mr. Shenkman.

29. According to Mr. Novak, the Board removed Mr. Shenkman because he began to miss most of the board meetings. (Tr. 12/4/23 at 153:17-154:9.) Mr. Synyanskyy also testified that Mr. Shenkman missed board meetings and testified that Mr. Shenkman was removed from the ROI Entities' Boards because of various incidents of mismanagement. (*See, e.g.,* Tr. 12/4/23 at 39:17-44:2, 44:20-45:21, 46:22-49:4, 153:17-154:9.)

30. On July 13, 2015, Mr. Shenkman, through his counsel, sent a letter to the ROI Entities enclosing an arbitration demand against ROI Ltd., and others, as well as a draft of a payoff letter to EPAM. Mr. Shenkman asserted that the ROI Entities owed him and the Shenkman Trust $3,873,755 in principal and interest on loans they made to the ROI Entities between 2006 and 2012. (Stipulated Facts at 4:6-9; Tr. 12/4/23 at 80:8-81:21, 82:9-13, 149:1-11; Tr. 12/5/23 at

7

166:6-167:23; Exs. 2-3, 6-8.)

31. Mr. Shenkman demanded that the ROI Entities forward the payoff letter to EPAM, but they refused. (Tr. 12/5/23 at 168:10-19, 169:2-7.)

32. Mr. Shenkman testified that neither he nor his attorney sent the payoff letter to EPAM. (*Id.* at 257:22-258:5.) The Court credits this testimony because there is no evidence or testimony to contradict it.

33. On July 16, 2015, Mr. Shenkman and the Shenkman Trust filed the arbitration demand, which was later dismissed for lack of arbitral jurisdiction. (Stipulated Facts at 4:10-13.) Neither Mr. Shenkman nor the Shenkman Trust ever renewed the claims made in the demand. (*Id.*)

34. The Court finds that the relationship between the ROI Entities and Mr. Shenkman was not amicable by mid-July 2015.

**D.   The ROI Entities and EPAM Do Not Complete the Transaction.**

35. According to Mr. Novak, the ROI Entities advised EPAM of Mr. Shenkman's arbitration demand at some point shortly after they received it. EPAM did not withdraw from the transaction at that time. (Tr. 12/4/23 at 157:2-7.)

36. By early August 2015, the ROI Entities and EPAM were at an impasse about how to deal with Mr. Shenkman's arbitration demand.

37. Based on the deposition testimony presented to the Court, Mr. Dobkin did not waver in his position that EPAM wanted "clean title" and some form of settlement between the ROI Entities and Mr. Shenkman to go forward with the ROI-EPAM deal. (Dobkin Depo. at 28:4-16, 29:19-30:2, 35:3-8, 37:5-38:9, 47:9-24.)

38. The ROI Entities were willing to either put funds in escrow for EPAM or to indemnify it from any claims but would not pay Mr. Shenkman directly because, in their view, they did not owe any debts to him. (Tr. 12/4/23 at 83:20-85:18, 157:2-7, 157:22-159:15; Tr. 12/5/23 at 168:20-169:1, 169:8-22, 171:8-21, 173:17-174:3, 180:4-15.)

39. The transaction with EPAM was financially important to the ROI Entities. (*See, e.g.,* Tr. 12/4/23 at 77:21-78:3.)

8

40. In contrast, the transaction did not have "any strategic meaning for EPAM. It was kind of a cheap asset, which we can pick it up [*sic*]." (Dobkin Depo. at 26:5-9; *see also id.* at 16-17 ("the significance of the transaction was pretty low").)

41. As a shareholder, Mr. Shenkman would not have benefited if the transaction failed.

E.   **Mr. Shenkman's Business Propositions to Mr. Dobkin.**

42. Mr. Shenkman knew Mr. Dobkin prior to the ROI Entities' negotiations with EPAM. (Tr. 12/4/23 at 68:5-14; Dobkin Depo. at 64:23-65:1.)

43. In the "latter part" of 2015, Mr. Shenkman approached Mr. Dobkin with some opportunities that were unrelated to ROI. (Tr. 12/5/23 at 226:24-228:1, 230:10-17, 231:22-232:2.)

44. One of those opportunities involved Vimpelcom, a telecommunications company. Mr. Shenkman estimated that opportunity was on a scale of at least $10,000,000. (*Id.* at 230:18-21, 231:18-20, 232:18-20.)

45. Mr. Dobkin was interested in the Vimpelcom opportunity, and EPAM created a presentation for Vimpelcom. (*See, e.g.,* Tr. 12/5/23 at 233:14-234:12, 234:14-235:14; Ex. 24 (Email dated 8/4/15 from Mr. Dobkin to Mr. Shenkman); Ex. 25 (EPAM Presentation re Vimpelcom dated 8/4/15); Dobkin Depo. at 70:6-24.)

46. Mr. Shenkman was unable to estimate how long it would have taken EPAM to create the presentation for the Vimpelcom opportunity.

47. The presentation does not contain information tailored to Vimpelcom. It consists of basic information about EPAM and its customers. The Court finds it plausible that EPAM could have prepared that presentation after Mr. Shenkman was removed from the ROI Entities' Board. (Tr. 12/5/23 at 240:24-241:19; Ex. 29.)

48. Vimpelcom did not engage EPAM. (Tr. 12/5/23 at 235:20-236:5.)

49. According to Mr. Dobkin, the potential Vimpelcom deal did not influence EPAM's decision on the EPAM-ROI transaction. (Dobkin Depo. at 86:21-24.) None of the ROI Entities' witnesses contradicted that testimony.

50. Mr. Shenkman also presented a banking opportunity to EPAM. He presented that opportunity after the ROI-EPAM transaction fell through and after he was removed from the ROI

9

Entities' Boards. (Tr. 12/5/23 at 236:11-25, 237:4-238:22; Ex. 10 (Email dated 10/27/2015 from Shenkman to Dobkin regarding "buddybank").)

## CONCLUSIONS OF LAW

1. To prevail on their claim for intentional interference with prospective economic advantage, the ROI Entities must prove that Mr. Shenkman engaged in intentional and wrongful acts designed to disrupt ROI's relationship with EPAM and that they suffered economic harm proximately caused by his acts.[10] *Korea Supply Co. v. Lockheed Martin Corp.*, 29 Cal. 4th 1134, 1153 (2003) (citation omitted).

2. Even if Mr. Shenkman acted with an improper motive, that would not be enough to show he is liable on this claim. The act of interference must be independently wrongful, *i.e.*, it must have been "proscribed by some constitutional, statutory, regulatory, common law, or other determinable legal standard." *Id.* at 1158-59 (finding actions that violated the Foreign Corrupt Practices Act qualified as independently wrongful).

3. To prevail on their breach of fiduciary duty claim, the ROI Entities must prove: (1) they had a fiduciary relationship with Mr. Shenkman; (2) Mr. Shenkman breached that duty; and (3) "damage proximately caused by that breach." *Meister v. Mensinger*, 230 Cal. App. 4th 381, 395 (2014).

4. Mr. Shenkman owed the ROI Entities and their shareholders a fiduciary duty while he was on their Boards.[11] *See, e.g., Jones v. H.F. Ahmanson & Co.*, 1 Cal. 3d 93, 110 (1969); Cal. Corp. Code § 309(a). Mr. Shenkman did not dispute that he owed them this duty. (12/4/2023 Tr. at 8:18-22.)

5. The ROI Entities contend that they have proved Mr. Shenkman engaged in independently wrongful conduct and breached his fiduciary duties because: (1) Mr. Shenkman

---

[10] On the first day of trial, Mr. Shenkman conceded three of the elements of this claim: (1) that the ROI Entities and EPAM had a relationship with the probability of future economic benefit to the ROI Entities; (2) he knew of the relationship; and (3) the relationship was disrupted. (12/4/2023 Tr. at 7:3-8:9; *see also* Stipulated Facts at 4:1-2 ("As a director, Shenkman knew of the ongoing negotiations with EPAM and the end of the July 2015 contemplated closing date.").)

[11] The ROI Entities do not assert that Mr. Shenkman was a majority shareholder of either entity.

filed the arbitration in bad faith and without a legal basis for believing the loans were valid; and (2) he presented other business opportunities to EPAM while the ROI Entities and EPAM were negotiating the EPAM transaction.

6.    The ROI Entities did not meet their burden to show by a preponderance of the evidence that the Letter Agreement encompasses the three loans addressed in the Loan Agreement. (Letter Agreement at 1, 8-10.)  Section 3.7 of the Letter Agreement contemplates that there were loans that were not otherwise considered capital contributions.  Further, as set forth in FOF 14, the ROI Entities carried those loans on their books until their Board declared the loans null and void at the June 8, 2015 Board meeting.

7.    Based on the evidence discussed in FOF 3 through FOF 16, the Court concludes that there was a good faith dispute over the validity of the loans and that Mr. Shenkman's decision to file the arbitration demand does not constitute an independently wrongful act.  Because there is no evidence that Mr. Shenkman or his counsel forwarded the demand letter to EPAM, there is no evidence that letter caused the ROI-EPAM transaction to fail.  Finally, the Court concludes that there is insufficient evidence to show it is more probable than not that it was Mr. Shenkman's decision to file the arbitration, rather than the ROI Entities' unwillingness to resolve the matter directly with Mr. Shenkman, that caused the ROI-EPAM transaction to fail.

8.    Based on FOF 50, Mr. Shenkman cannot be held liable on either claim for presenting the buddybank opportunity to EPAM.

9.    The Vimpelcom opportunity presents a closer question in terms of its timing. Assuming Mr. Shenkman was still on the ROI Entities' Boards when he presented the deal, there is no evidence that Mr. Shenkman used confidential information that he obtained from the ROI Entities or that he used information that Mr. Dobkin did not already have in an effort to dissuade EPAM from going through with the transaction.

10.   The ROI Entities also did not present any evidence to contradict Mr. Dobkin's testimony about why EPAM withdrew from the proposed transaction.  (*See* FOF 49.)  The Court concludes that the ROI Entities failed to show by a preponderance of the evidence that the Vimpelcom proposal caused EPAM to withdraw from the deal.

11

**CONCLUSION**

For the foregoing reasons, the Court finds in favor of Mr. Shenkman and against the ROI Entities. The Court will issue a separate judgment, and the Clerk shall close the file.

**IT IS SO ORDERED**.

Dated: December 6, 2024

_____
JEFFREY S. WHITE
United States District Judge